# Rice et al. v. Rice et al.

(Decided May 17, 1932.)

FRED HOWES for appellants.

KIRK & WELLS for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

This appeal requires the construction of a lease executed and delivered for the purpose of mining coal,

and the determination of the right of a lessor to reenter and take possession of the leased premises under the facts presented. A synopsis of the material facts is presented in the brief of the appellant, the correctness of which is concurred in in the brief of appellees. The facts are substantially as follows:

Sherman Rice and Emma Rice executed and delivered to Crate Rice on January 12, 1924, the lease involved, wherein it was stipulated that a rental of 12½ cents per ton for each ton of 2,000 pounds of coal mined and sold from the premises was to be paid by the lessee.

Therein:

"It is further agreed by the parties of the second part that they will use reasonable diligence, means and methods to mine a reasonable amount of coal from said premises during the first twelve months from the date hereof to make a paying operation, and thereafter they agreed to pay first parties a minimum sum of four hundred ($400.00) dollars, as royalty for the second year of the life of this lease whether the coal mined will amount to such sum or not at the aforesaid prices of twelve and one-half cents per ton, and for the third and each subsequent year of the tenure of this lease, the second party agrees to pay the first parties a minimum royalty of six hundred ($600.00) dollars per annum, while operated by Crate Rice, but if for some means this lease changes hands the minimum royalty shall advance to eight hundred ($800) dollars per annum, whether the coal mined in any such year amounts to said sum or not at the said rate per ton, but if the second party shall not mine in each year as much coal as shall, at the rate of royalty above mentioned amount to the minimum royalty for said year, they shall have the right during the next succeeding year to mine free from royalty enough coal at the rate of royalty aforesaid to make up the difference without interest, between the rate of royalty aforesaid on coal actually mined in such year and the minimum royalty paid for such year, provided that no coal shall be mined free in any year on account of any deficiency in any preceeding year until the same amount of coal required to pay the minimum royalty for the year in which said coal is mined free

shall have been first mined, and no payment in excess of the minimum of any year shall be credited as against the deficiency of any subsequent year.''

The lease also provided that ''all payments hereunder shall be made on the 15th day of each month for the coal mined during the preceding month.'' It was further agreed:

''That the rents and royalties hereinbefore mentioned shall be deemed a lien reserved upon the demised premises or property and the improvements thereon, and this lease and leasehold estate shall be subject to a lien for all unpaid rents and royalties in favor of the first parties and may be sold when same shall become due and unpaid for a period of ninety (90) days or more and, at the election of first parties, such liens shall be enforced by a suit in any court of competent jurisdiction.''

The lessee also agreed to furnish the lessor such maps of the mine as are required to be made by the statutes of Kentucky, and to keep correct amounts of all coal mined and removed from the premises, which accounts were to be open to the inspection of the lessor, his agent or attorney, at all reasonable times.

To protect the lessor against violation of the covenants of the lease, this provision was inserted in it:

''It is further understood and agreed that, if said parties of the second part shall fail to pay any of the royalties or other payments at the time or in the manner hereinbefore provided or shall fail to keep and perform any of the covenants and agreements on their part to be kept and performed hereunder, then this lease shall become null and void at the option of said parties of the first part; and said parties of the first part shall have the right to enter upon said premises and expel said parties of the second part therefrom and again have, repossess and enjoy the same as if this lease had not been executed.''

In April, 1924, Crate Rice began operations which were suspended in June of the same year. During this period, he shipped 12 or 13 cars of coal. He resumed operations in September, 1924, and continued until January or February, 1925, during this time he mined and

shipped about the same number of cars. On October 24, 1926, he transferred the lease to E. E. George. From the time Crate Rice suspended operations in January or February, 1925, no coal was mined or shipped by him. George owned the lease and actually had charge of the mine and its operation from the date of his purchase until some time in December, 1925. During the period of his ownership he mined and shipped 10 or 12 cars of coal. On January 2, 1928, George transferred the lease to L. O. Knipp. At the time Knipp acquired ownership he was a nonresident, and absent from the state of Kentucky, residing at Philadelphia, Pa.

After Knipp acquired title to the lease and mining equipment, Lawrence Conley who had been foreman of the mine under George, was employed by Knipp to run the mine for him, Knipp agreeing to pay him $100 per month, house rent, and coal for the use of his dwelling. Conley thereafter merely lived in the house. No operations of the mine was engaged in by Knipp. Conley continued to occupy the dwelling and engage in other employment. No wages were ever paid by Knipp to Conley. Crate Rice claims that, for about two months before Sherman Rice re-entered and took possession of the leased premises, he had been in the employ of Knipp; that Knipp was supposed to pay him wages of $100 per month which were not paid. Crate Rice, after he was employed by Knipp, engaged in no work at the mine. He claims that in August, 1926, he employed Sherman Rice to perform certain services at the mine for which he agreed to pay him $50, and which he paid by cash $25 and the balance by his individual accounts against Sam Conley and R. T. Hackworth. It is not shown that Knipp had any knowledge of this transaction.

We may here state that, notwithstanding Crate Rice admits his employment by Knipp and Knipp's ownership of the lease and mining equipment, he claimed at the time 'to be the owner of the lease.'' He does not explain how he became the owner after his sale to George and after Knipp acquired title. It is apparent that he regarded the lease as abandoned by Knipp, and his claim of ownership was by virtue thereof, and not by reason of the acquisition of the title of Knipp. He had not seen either George or Knipp for two years, nor does he claim that he even heard from them during that time.

No coal was mined or shipped after Knipp acquired title to the lease and equipment, except 4 cars which were mined and shipped by Wayne Rice, and the royalty rental to which Sherman Rice was entitled on these 4 cars was not paid to him. Wayne claims that he had an arrangement with Crate Rice to mine and ship these 4 cars, and that he sold 1 car to Crate Rice and the other 3 to the Tildesley Coal Company. It does not appear that Knipp had any knowledge thereof. By his arrangement with Crate Rice, Wayne Rice was to retain whatever profit was made on the coal mined by him. During Crate Rice's ownership of the lease he acquired by purchase and placed on the leased premises mining equipment and supplies including rails, cars, and mining tools at a cost of $9,500. On his sale of the lease to George, he sold the equipment and supplies to him. By the sale of the lease by George to Knipp, the title to the equipment and supplies passed to Knipp, with the obligation on him to pay any unpaid balance of the existing debts of Crate Rice against the lease and equipment, with the privilege of taking credit therefor on the note which was delivered to Crate Rice as evidence of the consideration. During the time Crate Rice was operating the mine, Sherman Rice paid for him and furnished merchandise to his employees to the amount of about $800. At the time Crate Rice sold the lease and equipment to George, he was owing Sherman Rice a balance of $150 of the minimum rental of the second year of the lease. This was a portion of the indebtedness of Crate Rice which George assumed and agreed to pay as a part of the consideration for the lease and equipment and which Knipp assumed and agreed to pay as a part of the consideration to George for the lease and equipment. While George owned and operated the lease he became indebted to Sherman Rice for money advanced to assist him in defraying the expenses of the mining operations. After Knipp became the owner of the property, Clark was a representative of Knipp in his ownership of the property, and as such representative he obtained from Sherman Rice, for the benefit of Knipp, $125, for which he executed and delivered to Sherman Rice, Knipp's check. The check was presented for payment in the usual course of business, payment was refused by the bank upon which it was drawn, and it is yet unpaid. The amounts advanced by Sherman Rice and paid for Crate Rice, George, and Knipp equaled, if they did not exceed, the

royalty received by Sherman Rice during their operations. During the summer and fall of 1926, prior to the 27th day of October, Crate Rice purchased and caused to be delivered on the leased premises, small quantities of mining supplies. It is fairly shown that he did this on his own accord. It is not shown that Knipp knew he was doing so. After Knipp became the owner of the lease and equipment he did not communicate directly or indirectly with Sherman Rice, nor give any attention in person to the lease and mine or the mining equipment, except by a letter which we shall hereafter consider. After making arrangements with Conley and Crate Rice, he not only failed to pay them, but did not require of them the performance of any services in connection with the lease, the mine, or mining equipment. Except the making of the arrangements with them by which he agreed to pay them, it is not shown that he required of them, or that they performed for him, any services, or that he even communicated with them. Crate Rice was engaged in the dairy business, and neither he nor Conley was more than a mere nominal employee of Knipp. His inattention to the lease and mining property permitted Crate Rice to make an arrangement with Wayne Rice, whereby Wayne mined and sold coal without accounting to Knipp therefor, or paying to Sherman Rice the 12½ cents per ton royalty on the coal mined by him.

The facts and circumstances and context of the letter, which we will hereafter consider, show that Knipp had abandoned the lease before the filing of this action. At the time of the bringing of it, Knipp was not present. It does not appear that he even had knowledge of its institution. He took no interest in it during its pendency. He did not testify, and, so far as the record shows, the action was instituted by Crate Rice and his attorney, using Knipp's name as a party. During the summer of 1926, Crate Rice undertook to reach a settlement with Sherman Rice of his indebtedness to him, including the $150 balance on the minimum royalty for 1925. The proposition of settlement began with the sum of $700 and was raised to $1,000, coupled with the condition that Sherman Rice execute and deliver a new lease to Crate Rice with a more favorable provision relating to the payment of the minimum royalty. The last proposition of settlement fixed the amount to be paid by him at $1,500. No settlement was reached, and no money was paid by Crate Rice to Sherman Rice. The debt which

Crate Rice was endeavoring to settle was the same which George assumed and agreed to pay as a part of the consideration of the lease and mining equipment, and which Knipp agreed to pay for George as a part of the consideration of the lease and equipment sold by George to him, plus the minimum royalty which had accrued after George's and Knipp's purchase of the lease.

With the conditions existing and under the circumstances as we have stated them, on the 27th day of October, 1926, Sherman Rice re-entered and took possession of the leased premises and caused notice thereof to be addressed to Crate Rice, Elmer George, and L. O. Knipp, and a copy thereof to be delivered to Crate Rice; George and Knipp being absent from the state at that time. On November 20, 1926, Crate Rice, with Emma Rice, Moses Rice, and C. C. Rice, F. B. Preston and the Enterprise Wheel & Car Corporation Inc., as creditors of Crate Rice, George, and Knipp, the owner of the lease and mining equipment, filed in their names and Crate Rice's, George's, and L. O. Knipp's, this action against Sherman and Emma Rice to have declared unlawful and wrongful the re-entry and possession of the leased premises and the mining equipment, of Sherman Rice, and to have the same restored to Crate Rice, E. E. George and L. O. Knipp. A decree was entered declaring his re-entry and possession of the leased premises wrongful.

They also sought to recover of him $25,000 damage. The issue as to the damage was reserved by the court with the permission to each party to take evidence pertaining thereto. Sherman Rice and Emma Rice have appealed.

The institution of this action in the names of both the creditors and the holder of the legal title to the lease and mining equipment manifestly produced a confusion of issue in the minds, not only of the appellees and their counsel, but in the mind of the trial court. The rights of Crate Rice, Emma Rice, Moses Rice, C. C. Rice, and F. B. Preston, E. E. George, and the Enterprise Wheel & Car Corporation, Inc., as secured creditors, must be measured and determined by those of Knipp, the holder of the legal title to the lease and the mining equipment, thus owned by him. Section 2316, Ky. Statutes; Cassidy v. E. M. T. Coal Co., 204 Ky. 278, 264 S. W. 744; American Wholesale Corp. v. F. & S. Oil & Gas Co., 242 Ky. 356, 46 S. W. (2d) 498; Wender Blue Gem Coal Co. v.

Louisville Property Co., 137 Ky. 339, 125 S. W. 732, 734; Meyer Bros.' Assignee v. Gaertner, 106 Ky. 481, 50 S. W. 971, 21 Ky. Law Rep. 52, 45 L. R. A. 513. Where a coal lease is canceled, a lien or mortgage created or executed by the lessee on the property covered by the lease cannot be enforced as against the lessor. There is an exception to this general rule, if the lien or mortgage existed before the property was carried on the leased premises. The judgment·in this case does not determine the right of the claimants of the liens as against Sherman Rice; for this reason we refrain from doing so in this opinion.

The provision in the lease authorizing Sherman Rice to re-enter and take possession of the leased premises is valid and enforceable. Wender Blue Gem Coal Co. v. Louisville Property Co., supra. It should be construed from the standpoint of both parties. Ward v. Daugherty, 228 Ky. 326 14 S. W. (2d) 1089; Fox Petroleum Co. v. Booker, 123 Okl. 276, 253 P. 33. It expressly provides for the payment of the minimum royalty each year after the first. The appellants insist that the clause, "All payments hereunder shall be made on the 15th day of each month for the coal mined during the preceding month," requires the minimum royalty as well as the 12½ cents per ton of 2,000 pounds each, to be paid by the month. The appellees contend the contrary. It is unnecessary to determine which of these contentions is correct. It is admitted that the $150 balance of the minimum royalty for the second year of the lease was not paid prior to nor since the re-entry and retaking possession of the leased premises by Sherman Rice. The obligation of the owner of the lease to pay the whole of the minimum royalty for the second year was a continuing one from the time it became due. The provisions of the lease authorizing the re-entry and retaking possession of the leased premises by Sherman Rice was for his protection. It is conceded that Crate Rice, during the term of the lease, was insolvent. It is admitted that Knipp was, during the same period of time, a nonresident of the state, and it does not appear that either George or Knipp, during their respective ownership of the lease, owned any property situated in Kentucky other than the lease and mining equipment thereon, and, if they were not insolvent during their respective ownership, they were neither mindful of, nor prompt to pay, their debts.

The operation of the mine by Crate Rice, George, and Knipp was neither profitable to them nor Sherman Rice. During their ownership of the lease they created and permitted liens to accumulate on the property. They permitted coal to be removed from the mine and allowed it to be worked without any returns thereof to the lessor.

Under the facts and circumstances shown in the present case, it would be unconscionable to return to them the leased premises or to require the lessor to surrender same to the lienholders for the satisfaction of their debts unless their liens are within the exception indicated. It is apparent that, because of the insolvency of Crate Rice and the nonresidency and disinterestedness of Knipp in the lease, should the mine and property be restored, the lease would, not only be ineffectual, but valueless to Sherman Rice, as well as all parties connected with it.

On May 23, 1929, L. O. Knipp voluntarily wrote, signed, and mailed to Sherman Rice a letter wherein he proposed that, if Sherman Rice would prepare a lease for the property covered by the present lease, making its terms such that he could afford to develop the mine, and at a price that he could afford to mine the coal for the market, he (Knipp) "would arrange to get the plant started without any delay and do everything to make the mine and property worth while." In it he makes this statement:

> "My thought is to lease it with the privilege of purchase later on if you so desire. . . . If you will consider this proposition let us get together at once and get busy. The coal does not produce money in the ground and you and I might as well work out what money we have tied up as just to have a memory of it."

It is evident from this letter that Knipp had no intention of assuming charge of the development of the mine unless he could secure a new lease. His letter, together with his actions showing the absence on his part of any attention to, interest or concern himself in, the lease and the operations thereunder, are sufficient to authorize the conclusion that he had abandoned the lease prior to the time Sherman Rice re-entered and took possession of the premises, and that Knipp had no intention of again resuming operation of the mine and the development of the lease.

Abandonment consists of the actual act of relinquishment, accompanied with the intent and purpose to give up permanently the claim and right of property (Stinnett v. Kinslow, 238 Ky. 812, 38 S. W. (2d) 920; Seaboard Oil Co. v. Com., 193 Ky. 629, 237 S. W. 48; United Mining Co. v. Morton, 174 Ky. 366, 192 S. W. 79; Duncan v. Mason, 239 Ky. 570, 39 S. W. (2d) 1006; Napier v. Baker, 235 Ky. 724, 32 S. W. (2d) 49; American Wholesale Corp. v. F. & S. Oil & Gas Co., supra), though the mere absence from and nonuser of property do not prove an intention to abandon it. Farmers' Canal Co. v. Frank, 72 Neb. 136, 100 N. W. 286; Sandy River Coal Co. v. Champion Bridge Co., 243 Ky. 424, 48 S. W. (2d) 1062.

In United Mining Co. v. Morton, 174 Ky. 377, 192 S. W. 79, 83, it is said: "Except in the case of a perfect legal title to a corporeal hereditament, every right or interest in, title to, or ownership of property may be lost by abandonment. 1 C. J., p. 9. This rule applies to mining rights and privileges. Aye v. Philadelphia Co., 193 Pa. 451, 44 A. 555, 74 Am. St. Rep. 696; Wilmore Coal Co. v. Brown (C. C.), 147 F. 943, affirmed in 153 F. 143, 82 C. C. A. 295; Derry v. Ross, 5 Colo. 295. See, also, Bay State Pet. Co. v. Penn Lubricating Co., 121 Ky. 639, 87 S. W. 1102, 27 Ky. Law Rep. 1133." See Cox v. Colossal Cavern Co., 210 Ky. 612, 276 S. W. 540; Duncan v. Mason, 239 Ky. 570, 39 S. W. (2d) 1006; Napier v. Baker, 235 Ky. 724, 32 S. W. (2d) 49.

Like any other fact, abandonment may be shown by circumstances or by the actions, conduct, or declarations of the parties. Mr. Merrell, in his work entitled, "Covenants Implied in Oil & Gas Leases," at page 20 says:

"In the case of true abandonment the lessee's title is gone the minute he determines to give up the property and does some act in pursuance to that intention. . . . Abandonment is an intentional and voluntary relinquishment."

The conduct of Knipp is consistent with the theory of abandonment, and, if there remained any doubt of his original intention, his letter to Sherman Rice should be sufficient to remove all doubt from the mind of an average disinterested person. Knipp did not testify in the case. His letter affords ample explanation of the reason for his failure to testify. The failure of a party to

an action to call even a mere witness known to be in the possession of important facts, or to explain his failure is a circumstance from which it is allowed to be inferred that such witness would not sustain the party in whose favor his testimony would be essential. Star Mills v. Bailey, 140 Ky. 194, 130 S. W. 1077, 140 Am. St. Rep. 370.

The appellees rely on an employment in August, 1926, of Sherman Rice by Crate Rice to perform certain services around the mine, and the fact that Crate Rice caused, about the same time, mining supplies, with the knowledge of Sherman Rice, to be delivered on the leased premises, as an estoppel of Sherman Rice to assert his right to re-enter upon the leased premises.

In Hodge Tobacco Co. v. Sexton, 166 Ky. 223, 179 S. W. 36, 38, it is said:

"An 'estoppel' means where one is the owner of property or has a right, but is precluded from claiming the property or to assert the right on account of some representation or act of his in regard to the property or right, which has induced another, not knowing the facts, to act to his prejudice. An element that is essential to make an equitable estoppel is that the person who is invoking it must have been influenced by or relied upon the representations or conduct of the person sought to be estopped, and was thereby induced to do something to his prejudice. Taylor v. Jenkins, 65 S. W. 601, 23 Ky. Law Rep. 1574; Smither v. McGinnis, 35 S. W. 630, 18 Ky. Law Rep. 134; Wilson v. Scott, 11 Ky. Law Rep. 370. It is also essential that the one to be estopped must have had knowledge of the facts, and the one relying upon the estoppel must have been ignorant of the truth, and was led into doing something that he would not have done but for the silence of the one sought to be estopped. Newell v. Dunnegan, 1 Ky. Law Rep. 354; Milby v. Akridge, 59 S. W. 18, 22 Ky. Law Rep. 867; Watson v. Prather [Ky.], 65 S. W. 439."

The facts presented do not bring them within the doctrine of estoppel enunciated in the case supra. They are presented by mere claimants of liens for the benefit of Knipp, but it is not shown that he had any knowledge of the facts relied upon as an estoppel. Knipp cannot rely upon facts as constituting an estoppel of which he had

no knowledge. The right of Sherman Rice to re-enter and take possession of the leased premises may well be rested upon both an abandonment of the lease by Knipp and the express provisions of the lease authorizing him to re-enter and take possession of the premises because of the failure of the lessee to pay the minimum royalty as it was agreed to be paid by the express provisions of the lease. The judgment entered by the trial court was neither authorized by the law nor supported by the evidence. The language of the court in Wender Blue Gem Coal Co. v. Louisville Property Co., supra, is applicable to the facts in the present case:

> ". . . A court of equity will relieve against a forfeiture on account of the nonpayment of rent where circumstances are shown justifying the interposition of the chancellor, the court cannot make for the parties a different contract than they have made for themselves. The rent here is long past due, no tender of the amount due is made, and what the future would bring forth as to a profit being made in the operation of the mine is purely speculative. The tenant is insolvent, and other liens are asserted on the property." Taylor on Landlord and Tenant, sec. 495; 24 Cyc. 1352; Wilson v. Jones, 1 Bush 173.

Judgment reversed for proceedings consistent with this opinion.